IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| THE LUO GROUP LLC D/B/A, | ) | |
| TAGO INTERNATIONAL | ) | |
| CENTER | ) | |
| | ) | |
| GODFREY TAGO | ) | |
|     Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| | ) | |
| ANDREW PERKEL, | ) | |
| | ) | |
| SC APARTMENTS LLC | ) | |
| D/B/A Bolton Village | ) | |
| | ) | |
| LANDLOCKED, LLC | ) | |
| D/B/A Bolton Village, | ) | |
| | ) | |
| | ) | JURY TRIAL DEMANDED |
|     Defendants. | ) | |

## **COMPLAINT**

Plaintiffs, The Tago International Center and Mr. Godfrey Tago, (hereinafter

"Mr. Tago" or "Plaintiffs") file this complaint against Defendants seeking redress

of unlawful discrimination pursuant to 42 U.S.C. § 1981, retaliation, assault,

breach of contract, intentional infliction of emotional distress, and tortious

interference with business operations.

## <u>INTRODUCTION</u>

On Saturday, May 22, 2021, Defendant Perkel arrived at the leased Property

with an AR15 and handgun—threatening attendees at a social event, yelling, "Get

out of my way! You N******! Where is he? Where is he?" Mr. Tago asked

Defendant Perkel to leave the premises because he was scaring his event guests,

including children. Defendant Perkel continued to threaten Mr. Tago. He retreated

to his vehicle to obtain a handgun and brandished it underneath his shirt,

threatening Mr. Tago to 'stop playing with him.'  Unphased by reason or video

recording, Mr. Tago had to call 911 to request assistance from Atlanta Police.

Defendant Perkel, alongside his co-defendants, have engaged in a series of

discriminatory acts against Mr. Tago and his guests to force him out of a 7.5-year

commercial lease for the property located at 2011 Bolton Road, Suites 206, 208

and 209, Atlanta, Georgia 30318.  In addition to direct threats of bodily harm,

Defendants have alleged breach of contract to cover discriminatory animus, have

arrived at events to intimidate and harass guests, have attempted to coerce Mr.

Tago into signing a contract addendum to frustrate the lease purpose, have advised

Mr. Tago to stop servicing black patrons and black events, refused to accept rental

payments without legal basis, and others. All of Defendants intimidating actions are designed to interfere with Mr. Tago's legal interest in the leased premises.

Bolton Village, by and through its executives, Landlord Andrew Perkel and others, have violated Tago International Center's and Mr. Tago's (collectively "Plaintiffs") right to enjoy the premises as a black tenant pursuant to 42 U.S.C. § 1981. Defendants have engaged in humiliating tactics to interfere with Plaintiffs' business and contract—for example, the Landlord explicitly refers to black people as "black pieces of shit," "your kind," and encouraged Mr. Tago to host the 'right type of events like bar mitzvahs' in contravention of Section 1981. Because of Defendants actions, Mr. Tago has suffered mental anguish, embarrassment, humiliation, and loss of business. Plaintiffs seek compensatory damages, punitive damages, and equitable relief for their unlawful behaviors.

## **PARTIES**

1.

The Luo Group LLC D/B/A Tago International Center is a limited liability company incorporated in Georgia with a principal place of business located at 2011 Bolton Road, Suite 209, Atlanta, Georgia 30318.  The Tago International Center is an events company that specializes in hosting birthday, celebration, and

other special occasion events.  The Tago International Center submits to the jurisdiction of this Court.

2.

Mr. Godfrey Tago is an adult Black male business owner. Mr. Tago is the Principal of the Tago International Center. At all times relevant to this action, Mr. Tago has been and continues to be a resident of Atlanta, Georgia. Mr. Tago submits to the jurisdiction of this Court.

3.

Defendant Andrew Perkel, a white male, is the agent, landlord, manager, and authorized designee of SC Apartments LLC and Landlocked LLC (hereinafter "Landlords" or "Defendants") and is responsible for the leasing, managing, and operating of 2011 Bolton Road, Atlanta, Georgia 30318 and is personally involved in creating, authorizing, and participating in the unlawful practices challenged by the Plaintiffs.

4.

Defendant, SC Apartments LLC Village (hereinafter "Landlord" or "Defendant") is a Georgia limited liability company with a principal place of business located at 455 Ferry Landing, Atlanta, Georgia 30328.  SC Apartments LLC is one of two lessors on the lease agreement governing this Action. SC Apartments LLC is a

joint owner of the leased premises located at 2011 Bolton Road, Atlanta, Georgia 30318.

5.

Landlocked, LLC is a Georgia limited liability company D/B/A Bolton Village (hereinafter "Landlord" or "Defendant"), is a Georgia for-profit limited liability corporation with a principal place of business located at 2870 Peachtree Road, Suite 516, Atlanta, Georgia 30305. Landlocked, LLC is one of two lessors on the lease agreement governing this Action. Landlocked, LLC is a joint owner of the leased premises located at 2011 Bolton Road, Atlanta, Georgia 30318.

## **JURISDICTION AND VENUE**

6.

This action arises under laws of the United States, including 42 U.S.C. § 1981. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1343(a)(3) and (a)(4).

7.

This Court has authority to award costs and attorneys' fees under 42 U.S.C. § 1988 and 29 U.S.C. § 794(a).

8.

Venue is proper in the Northern District of Georgia pursuant to 28 U.S.C. §

1391(b)(1) and (b)(2). Defendants have their official residence in the Northern

District of Georgia, and a substantial part of the events and omissions giving rise to

the claims in this action occurred in this district.

## FACTS

### 9.

Mr. Tago[1] is an Black male who has been a successful business owner for 20 years.

### 10.

Mr. Tago turned a decrepit warehouse, with no HVAC, into a thriving event hall

with celebrity clientele.

## ORIGINAL LEASE TERMS

### 11.

On October 1, 2020, Mr. Tago signed a commercial lease entitled "Retail Lease"

with SC Apartments LLC and Landlocked, LLC on behalf of his business, The Luo

Group LLC D/B/A Tago International Center ("Tenant").  Mr. Tago is the

---

[1] At all times relevant to this Action, Mr. Tago was acting on behalf of The Luo Group LLC D/B/A The Tago International Center in furtherance of business operations as the Principal Officer thereof.  All pleadings herein referencing "Mr. Tago" or "The Tago International Center" shall be construed in the collective and applied to both Plaintiffs.

guarantor of the Retail Lease between The Tago International Center and the Defendants.

12.

The Retail Lease was for the subject property located at 2011 Bolton Road, Suite 209, Atlanta, Georgia 30318 (hereinafter "Property").

13.

Defendant Andrew Perkel, a white male, is the agent, landlord, and authorized designee of SC Apartments LLC and Landlocked LLC.

14.

Pursuant to the Retail Lease, the lease began on December 1, 2020, and expires on October 31, 2027.

15.

The Property is approximately 5,179 square feet and located on the second floor of the Bolton Village Shopping Center.

16.

Mr. Tago's paid a $12,946 Security Deposit to the landlord upon execution of the Retail Lease.

17.

Pursuant to the Retail Lease, The Tago International Center had to pay $0 per month for the first six months.

18.

Pursuant to the Retail Lease, The Tago International Center paid discounted rental fees for months 7-12.

19.

Pursuant to the Retail Lease, The Tago International Center had "normal business hours for an event center" Monday through Sunday. [Retail Lease pg. 4, p. N]

20.

Pursuant to the Retail Lease, Tenant shall pay rent to the Landlord advance on or before the first day of each calendar month during the term. [Retail Lease pg. 4, p. L]

21.

Pursuant to the Retail Lease, Tenant shall pay Landlord at the Property Manager's Address, or to such other person and/or address as Landlord may designate in writing.

22.

Pursuant to the Retail Lease, in relevant part, Landlord will make, or cause to be made, structural repairs to exterior walls, structural columns, roof penetrations and structural floors which collectively enclose the premises...

23.

Landlord shall not be liable for any failure to make repairs to or to perform any maintenance *unless such failure shall persist for an unreasonable time* after written notice of the need for such repairs or maintenance is received by Landlord from Tenant. (emphasis added).

24.

Pursuant to the Retail Lease, The Tago International Center was permitted to begin work 180 days from the commencement of the lease and had the following timeline:

1. Complete plans to the landlord January 15, 2021;

2. Permit application submitted March 1, 2021;

3. Permit in hand and construction commencement May 1, 2021;

4. Electrical complete September 1, 2021;

5. HVAC complete June 1, 2021;

6. Drywall complete November 1, 2021;

7. Final Inspection February 1, 2022; and

8. Certificate of Occupancy issued and sent to Landlord April 2022.

25.

Pursuant to the Retail Lease, Landlord covenants and agrees with Tenant that so long as Tenant pays the Rent and observes and performs all the terms, covenants, and conditions of the lease on Tenant's part to be observed and performed, Tenant *may peaceably and quietly enjoy the premise subject*, nevertheless, to the term and conditions of the lease, and Tenant's possession *will not be disturbed by anyone claiming by, through, and under Landlord.* (emphasis added)

## DEFENDANTS PROVIDED ASSURANCES FOR PARKING, PATIO USE, AND CONSTRUCTION TIMELINES TO INDUCE MR. TAGO INTO SIGNING THE COMMERCIAL LEASE

26.

On or about October 2020, Mr. Tago began negotiations with realtor Boris Gurbuz of Cushman & Wakefield (hereinafter "Mr. Gurbuz") for warehouse retail space located in the city of Atlanta.

27.

Mr. Gurbuz represented the Defendants.

28.

Throughout the lease negotiations, Mr. Tago discussed parking, security, patio, building improvements, build outs, bathrooms codes among other improvements with Mr. Gurbuz.

29.

Mr. Tago almost declined to pursue the lease agreement because the Property only provided 80 parking spaces to be shared among eight main businesses and approximately six subleased businesses which averaged between 2000-5000 square feet.

30.

To influence Mr. Tago to accept the lease, Mr. Gurbuz assured Mr. Tago that the patio and parking would be all his after 5:00 pm on weekdays and after 2:00 pm on weekends.

31.

While doing walkthroughs of the warehouse, Mr. Tago informed Mr. Gurbuz of several code violations in the building that could hinder his obtaining the Certificate of Occupancy, including but not limited to crooked demising walls, no secondary egress, cracked floors, and beam inaccuracies.

32.

In response, Mr. Gurbuz told Mr. Tago, "Don't worry, the landlord will take care of it once you prove to him that you can immediately start throwing parties and have a customer base, unlike the last tenant. Matter of fact, the landlord says since it's COVID, don't wait, do some parties to help you out."

33.

Mr. Tago expressed concerns to Mr. Gurbuz regarding COVID-19 city permitting delays and the expected construction timeline.

34.

To assuage Mr. Tago's concerns, Mr. Gurbuz promised that Defendants would help Mr. Tago with some events to sustain his business and minimize business disruptions.

35.

During their conversation, Mr. Gurbuz told Mr. Tago not to worry and said, "You have until 2022 to get your CO. City Hall is not functioning properly, and you can't determine when you get permits. He [Defendant Perkel] can't hold that against you but just make sure whatever you do Tago, always pay your rent. That's all Andrew cares about is money."

36.

In a conversation with Defendant Perkel, Defendant shared stories with Mr. Tago about how the hair salon owners, other tenants located within the shopping center property, had completed their buildout before calling inspectors.

37.

Defendant Perkel further stated, "The coffee shop was operating under someone else's license who I had to get rid of; he was bringing in the wrong crowd. But the dummy that I really feel bad for was Mike. He did things the right way and it took him a year to get his CO, so I felt bad for him."

38.

Defendant Perkel provided this information to Mr. Tago to reassure him and persuade him to sign the Retail Lease.

39.

Defendant Perkel told Mr. Tago, "As long as you don't bring heat to the building, I don't want inspectors coming here to start digging deeper and finding other flaws in the building."

40.

Defendant Perkel further stated, "My only concern was he [a previous tenant] was going to bring the wrong inspector who would then open a pandora box of issues with the building from my dumpster, sprinklers, elevators, beams, parking, and I

don't have the time for that. I'm selling the land next door to develop an apartment complex, so the less eyeballs from the city the better off we are."

## TENANT REQUESTS STRUCTURAL REPAIRS TO THE PROPERTY REPEATEDLY, BUT DEFENDANTS FAIL TO MAKE REPAIRS

41.

Pursuant to Article 15 and Exhibit B of the Retail Lease:

1. Landlord will fitness test the HVAC systems after the Tenants ductwork has been installed and will repair as necessary prior to the rooftop units becoming the responsibility of Tenant; and

2. Landlord will make, or cause to be made, structural repairs to exterior walls, structural columns, roof penetrations and structural floors which collectively enclose the Premises (excluding, however, all doors, door frames, storefronts, windows, and glass); provided Tenant shall give Landlord notice of the need for such repairs.

42.

On or about December 2020, Mr. Tago asked the property manager, Adam Blatt, to fix the structural attached issues such as HVAC, the weak beams, cracks on the floor, replace the extremely hazardous residential windows and the doors, but Mr. Blatt responded in person, "We have other issues on site, I'll get back with you."

43.

Mr. Tago reminded Mr. Blatt that someone could potentially lean on the windows, and the windows could fall out atop someone resulting in a lawsuit, but Mr. Blatt dismissively said they [Defendants] had other tenants in priority before him.

44.

On several occasions, Mr. Tago found the doors to his locked unit open.

45.

Mr. Tago and Defendants were the only parties who had access to The Tago International Center's unit.

46.

Per the lease agreement, Defendants must give notice to enter Mr. Tago's locked unit.

47.

In early April 2021, Mr. Tago arrived early and startled Defendant Perkel. When Mr. Tago asked the Defendant how he got into the building, he replied, "For some reason, we found your front door open, and the sprinkler company had been allowed to do a walk through."

48.

Defendant Perkel also informed Mr. Tago that he would need to replace all the sprinklers in the building and stated, "You got the space as is. Now, I can do it my way like I was going to construct the lobby egress to your space by forcing both you and Mike to pay for it, but I choose to be nice."

49.

Mr. Tago informed Defendant that the demising wall blocked off a second egress and was aware that Mr. Tago would not get a Certificate Of Occupany without one. Defendant Perkel denied knowledge despite the warnings from previous inspectors.

50.

The hazardous windows and doors around the space needed to be replaced.

51.

Defendant Perkel said he "would put in screws on each side of the windows for now and every other door complaint as long as it doesn't cost him over $500."

52.

On or about October 23, 2021, Mr. Tago contacted Atlanta City Hall and confirmed that the city of Atlanta had no records of the full blueprint of the building—as a result, the warehouse had gone undetected for many years.

53.

Upon information and belief, Defendants intentionally failed to update the blueprint records with the City to make tenants responsible for fixing code violations while escaping tax and compliance liability as the Property owners.

54.

In furtherance of their deceit, Defendants encouraged Mr. Tago to "hire private inspectors instead of city inspectors."

55.

To complete his due diligence, on or about September 2020, Mr. Tago called the Atlanta City Hall zoning department to confirm that the location was zoned to host various social events, including weddings.

56.

As a result of the novel COVID-19 pandemic and its impact on operations, Mr. Tago did not get a prompt response from Atlanta City Hall.

57.

Thereafter, Mr. Tago applied for permits via the Atlanta permitting website.

58.

The 2011 Bolton Road, Atlanta, GA 30318 address was continuously flagged by the Atlanta permitting website.

59.

Mr. Tago informed the Defendants about the delay in permitting.

60.

Defendant Perkel advised Mr. Tago not to worry because a restaurant downstairs was approved with a liquor permit.

61.

Upon additional probing regarding the restaurant, Defendant Perkel told Mr. Tago the owner of the restaurant was owned by an African American gentleman who sold organic food then said, "As usual, he couldn't sustain so he ran away."

62.

After many weeks, Mr. Tago received a call back from the zoning department informing him that the City of Atlanta was having issues finding any blueprints or records of the property but approved the Tago International Center because the adjacent units were properly zoned commercial units.

63.

Given the greenlight, Mr. Tago began the buildout process and hired Antrell Gales, a former City of Atlanta building inspector, to start his permitting and architectural processes. During this time, the City of Atlanta issued a COVID-19 clause allowing constructions with limited conditions without a permit.

64.

Once construction began, Mr. Tago discovered significant structural issues that delayed his ability to complete construction pursuant to the construction schedule in the Retail Lease.

## MR. TAGO IS GREETED WITH DISCRIMINATORY ALLEGATIONS UPON MOVING INTO 2011 BOLTON RD. – UNIT 209

65.

During Mr. Tago's first week of moving into the warehouse, he received a text message from Defendant Perkel informing him the tenants from the coffee shop were angry that he had been "moving furniture too much and was bothering the tenants downstairs," and if he could "please not do anything until after 2pm."

66.

In an effort to resolve the issue, Mr. Tago made alternate arrangements and attempted to apologize to the tenants, but they never sought to meet or interact with him.

67.

Although his lease agreement stated he had "normal business hours for an event center," Mr. Tago adjusted his entire business model to accommodate said request.

68.

The following week, Mr. Tago received a visit from another tenant who began

interrogating him and saying that he heard negative things about him in the Bolton

Village tenants group text.

69.

Upon further probing, the tenant informed Mr. Tago that "other tenants are

suggesting that you're going to open a ghetto nightclub and you are the reason

there's already been car break-ins." Another tenant disproved this statement by

confirming there was a spike in car break-ins prior to Mr. Tago signing his lease

and that it was "unfair to stereotype Mr. Tago."

70.

Mr. Tago disputed the discriminatory allegations, and informed Defendants and his

co-tenants that he was not opening a nightclub.

71.

On March 30, 2021, after the tenant's inquiry, Mr. Tago expressed his concerns

about purported racial profiling via email to Defendant Perkel and Mr. Blatt.

72.

Defendants continuously complained about lawful events because there were 'too

many wrong black people in attendance.' Black people were not received well by

the Defendants and other tenants.

73.

During the NBA All-Star weekend, Mr. Tago's hosted a few celebrity friends at

the Property on Sunday evening.

74.

Mr. Tago had to adjust his business operations because he feared that Defendants

would interfere with his event because his guests were African Americans.

75.

Defendant Perkel called to chastise Mr. Tago for purported "ghetto naked male

models harassing a white female lessee." A second tenant claimed heavy marijuana

use inside the leased Property. Instead of investigating the allegations, Defendant

Perkel immediately believed the complainant. To prove his innocence, Mr. Tago

invited Defendant Perkel and the complainant to inspect his unit to confirm the

absence of criminal activity.

76.

On or about March 8, 2021, Mr. Tago informed Defendant via email that he had

acquired private security in addition to the presence of Atlanta Police Department

officers for gatherings of more than 50 people.

77.

Mr. Tago received yet another call from Defendant Perkel attacking him based on alleged discriminatory rumors and noise ordinances. Without investigating the veracity of the complaints, the Defendant told Mr. Tago, "This is not what I signed up for," and that Mr. Tago was "bringing the wrong kind of black people to his beautiful location."

78.

Defendant Perkel told Mr. Tago that he "was under the impression you were going to do classy events such as weddings and bar mitzvahs."

79.

Mr. Tago was shocked and hurt by Defendant's racially insensitive comments and attempted to appease Defendants with a promised opportunity to tour the space following renovations.

80.

Mr. Tago declined to say anything else to Defendant Perkel for fear of additional retaliation.

81.

On or about March 2021, Mr. Tago informed Mr. Blatt via text message that he continued to have problems with the hazardous windows and was afraid the loose windows may fall on top of children who play below the adjacent sidewalk.

82.

Despite the safety risk and repeated notice, Mr. Blatt told Mr. Tago, "Andrew wants you to just put in screws on each side of the windows for now."

83.

In April 2021, Mr. Tago's windows were falling out of their frames and the unit had no operating heating and ventilation system.

84.

Defendants repeatedly and intentionally ignored Mr. Tago's complaints for repairs.

85.

Defendants did not treat other non-black business owners at the Property with the same level of disregard and neglect; for example, Mr. Tago witnessed the coffee shop receive preferential treatments for buildouts when they were shut down and Defendants fixed white tenants' windows.

86.

In a five-month period, Defendants have continuously ridiculed, intimidated, and interfered with Mr. Tago's ability to run his business for discriminatory reasons.

87.

On or about April 2021, Mr. Tago finished his buildout, and the racial hostility and discrimination increased. Defendants accused Mr. Tago of alleged criminal activity and violating lease terms without cause.

88.

Defendants accused Mr. Tago of car thefts, leaving trash around the building, and dirtying community bathrooms for discriminatory reasons.

89.

Upon information and belief, Defendants did not accuse other non-black tenants at the Property for the same violations.

90.

Upon information and belief, Mr. Tago was the only tenant at the Property required to expend funds to clean the community bathrooms and common areas, including remodeling the elevators and bringing all common areas up to code —a landlord designated expense.

91.

On April 11, 2021, Mr. Tago held an upscale fashion show; Defendant ridiculed Mr. Tago by calling it "a ghetto event," and accused Mr. Tago of putting on "a loud drug infested rave."

92.

Defendant Perkel told Mr. Tago that "the neighborhood was worried you'd bring thugs to shoot up the place and we wouldn't be able to get rid of you like some club in the adjacent neighborhood that they've been trying to get rid of in the last two years."

93.

Mr. Tago told Defendant Perkel the fashion show had fewer than 30 guests, and the event was secured by police. As done before, Mr. Tago explained that there was no mischief or "naked men" at his events.

94.

To appease the Defendant, Mr. Tago sent him pictures via text of the red-carpet fashion show on the patio.

95.

On or about April 24, 2021, Mr. Tago asked the Defendant to "stop judging or stereotyping all groups of black people as all ratchet or ignorant." Further in the discussion, Mr. Tago showed pictures of non-black guests who were present at the event. The photos of non-black attendees reassured the Defendant and briefly halted his race-based microaggressions.

96.

Mr. Tago extended an invitation to meet and apologize to the alleged

complainants, but Defendant responded, "Oh no, no, no, that's not necessary. I

have my city council guy who said it wasn't really that bad." Mr. Tago, then,

volunteered to start a valet system to ease tensions.

97.

Mr. Tago went to the varying tenants to apologize for the complaints, but they

advised Mr. Tago that they had never made a complaint against Mr. Tago. It was at

this moment, Mr. Tago knew the alleged complaints were coming from the

Defendants and *not* other tenants.

98.

The Defendant told Mr. Tago, "Everyone likes you. They just don't like the people

you bring here."

## AFTER MR. TAGO ASKS FOR THE DISCRIMINATION TO STOP AND FOR STRUCTURAL REPAIRS TO THE PROPERTY, DEFENDANTS RETALIATE.

99.

On or about April 2021, Defendant said to Mr. Tago, "Tell you what, how about

we just do a simple addendum, and you sign it, and everything will be kumbaya."

100.

The addendum included several clauses that prohibited Mr. Tago from enjoying the premises. These clauses included limiting Mr. Tago's use of the patio and restricting his events to "bar mitzvahs" and other limited events.

101.

Mr. Tago refused to sign the addendum, explaining that the new terms would only benefit Defendants and would frustrate the entire purpose of the Retail Lease.

102.

With the added stress and the pressure from Defendant Perkel to sign the addendum, Mr. Tago's ulcer resurfaced.

103.

Because Mr. Tago declined to sign the addendum, Defendants created additional procedural barriers for Mr. Tago to run The Tago International Center.

104.

Defendant Perkel required Mr. Tago to provide prior notice of all events to coordinate with other tenant events.

105.

Mr. Tago received a letter dated April 24, 2021, alleging he was in default of his Lease Agreement for 2011 Bolton Road, Suite 209, Atlanta, GA 30318.

106.

Contrary to the April 24, 2021 notice, Plaintiffs complied with all relevant laws.

Plaintiffs never engaged in or allowed criminal behavior to occur on the Property.

107.

Contrary to the April 24, 2021 notice, Plaintiffs did not use common areas without

landlord approval.

108.

Contrary to the April 24, 2021 notice, Plaintiffs maintained proper insurance

coverage for the Property and provided Defendants with notice thereof.

109.

Contrary to the April 24, 2021 notice, Plaintiffs have not breached "numerous rules

and regulations" of "excessive noise, smoking, vibrations, and nuisances."

110.

Defendants alleged Plaintiffs breached the contract to hide their discriminatory

motive.

111.

Mr. Tago received a supplement to the demand letter from April 24, 2021,

prohibiting Mr. Tago from using the outdoor space.

112.

On April 30, 2021, Mr. Tago received the First Amendment of Retail Lease, setting restrictions on his business practices.

113.

Mr. Tago received a Notice letter dated May 24, 2021, from Landlord indicating that the "LANDLORD DEMANDS POSSESSION" and he "shall surrender the space no later than Thursday, May 27, 2021, at 5:00 p.m."

114.

On May 22, 2021, Mr. Tago hosted an annual art show and Defendant Perkel arrived at the event belligerent. Defendant berated the valet using obscene, discriminatory language and attempted to shut down Mr. Tago's event.

115.

Mr. Tago had roughly 150 vendors and guests in attendance who witnessed Defendant belittling, yelling, and cursing at Mr. Tago.

116.

After repeated requests to stop, Defendant Perkel continued his harassing behaviors of Mr. Tago to intimidate and humiliate him.

117.

During the heated exchange, Defendant informed Mr. Tago that he had placed several cameras in and outside the building, without prior notice thereof.

118.

During the heated exchange, Defendant also rescinded parking access for Tago

International Center, making event hosting nearly impossible.

119.

Defendant shouted at Mr. Tago and told him he explicit "You f***** up" by not

signing the addendum so now his "lease was over," and that Mr. Tago needed to

pack up on Monday and give him his keys.

120.

Although Mr. Tago tried to diffuse the situation, the Defendant was not

receptive.  He acted with racial animus by calling Mr. Tago a "boy" and shushed

him away in front of roughly 150 vendors and guests.

121.

Defendant Perkel told Mr. Tago, "I tried to help you and you are now dead to me,

your lease is over, and this party is about to be shut down." He continued to tell

Mr. Tago, "I should have known better than to lease this out to black pieces of shit

like your kind."

122.

Defendant Perkel called Mr. Tago an explicit "M***** F***** and said, "The last

black guy who f***** with him was the previous tenant at my suite and he learned

a serious lesson, he ended up owing him $100,000 in tenant fees plus legal," so he "shouldn't f*** with him at all."

123.

The Defendant proceeded to berate Mr. Tago by stating, "You have two choices, we go to court and my team of attorneys bury you broke, or you write me a proposal by Monday, and I will consider writing you a tiny check and be glad I did that so don't go celebrating."

124.

Mr. Tago was overwhelmed, anxious, and humiliated by Defendants.  It had become even more clear that Mr. Tago's fears about retaliation had come to fruition.

125.

Defendant called the Atlanta Police Department. Once the police arrived, they informed Defendant that there was no crime being committed and they could not arrest Mr. Tago. They further explained to Defendant that having a lease gave Mr. Tago the right to invite and have guests.

126.

On May 23, 2021, Mr. Tago had a graduation event, and Defendant Perkel arrived at the event armed.

127.

Mr. Tago heard commotion in the front part of the Property. When he went to

investigate, Mr. Tago witnessed children frantically running and Defendant Perkel

walking erratically and recording the event.

128.

After spotting Mr. Tago, Defendant Perkel runs downstairs, enters his truck, and

retrieves an assault rifle and magazine.

129.

Defendant Perkel displays his assault rifle and brandishes it at Mr. Tago, saying

you "N****** better get off of my property!"

130.

Mr. Tago then tells the security to push the innocent bystanders, including children

and elderly guests, inside and to the back of the building.

131.

Mr. Tago further instructed the valet to record the events and Defendant yells at the

valet, "Well played," as they take out their cell phones and begin recording.

132.

Defendant continues to say, "I see y'all didn't learn your lessons yesterday, you're

going to learn today," then he went back to his truck to retrieve a smaller handgun.

133.

While recording witness statements, Mr. Tago walks over to Defendant Perkel who is hiding his gun with his shirt.  Mr. Tago could see the outline of the gun's barrel pointed in his direction.

134.

Mr. Tago asked why he was there with his gun, threatening his guests and asked him to leave, but Defendant said he would not because it was his property.

135.

Mr. Tago asked the Defendant to leave again and told him that he was intimidating his guests. Defendant told Mr. Tago that he had an AR15 in his car and had "many machine guns."

136.

In panic, Mr. Tago called 9-1-1. The Atlanta Police were dispatched to the scene and gave Defendant a final warning.

137.

After nearly three to four hours on the Property waiting for "the fire marshal and his city councilman friend," Defendant Perkel finally retreats.

138.

On May 24, 2021, Mr. Tago was sent a notice at his private residence to vacate the premises by May 27, 2021.

139.

On May 27, 2021, Mr. Tago had an initial inspection from the City of Atlanta and the inspector placed a "Stop Work Posted" on his door.

140.

The inspector made the following comments:

1. Mechanical, electrical, and building work has been done without permits.

2. No plumbing work has been done.

3. There is a lot of tension between the building owner, and the tenant.

4. All work must stop at this point.

5. Per Mr. Tago, they are using the space as an event hall for weddings, and things of that nature.

6. The permit expediter was on site and said they had been trying to get a permit since November.

141.

As a result of the "Stop Work Posted" on the door, Mr. Tago had to cancel all scheduled events at the Property.

142.

Because of Defendants vindictive, maniacal, and discriminatory behaviors, Mr.

Tago had to breach event contracts with his clients—forcing him to forfeit deposits

and revenue—his sole basis of business income generation.

143.

On June 1, 2021, Mr. Tago went to make his first rent payment of $3,236.88 to

Defendants.

144.

Defendants changed the payment information two months prior and intentionally

failed to notify Mr. Tago.

145.

Notably, the Defendants gave the new payment details to all Bolton Village

tenants, except Mr. Tago.

146.

After finally receiving the proper wiring instructions, Mr. Tago wired the funds

promptly to Defendants on June 2, 2021.

147.

On June 7, 2021, Mr. Tago's wire transfer was returned because Defendants' bank

was "unable to apply the funds as instructed."

148.

Defendants attempted to scare and intimidate Mr. Tago by direct threats of violence, termination of his lease agreement, retaliation after requesting repairs, and terroristic threats.

149.

Mr. Tago has lost a tremendous amount of revenue because of Defendants actions.

## COUNT I:
## CONTRACT DISCRIMINATION IN CONTRAVENTION OF SECTION 1981
*(Against all Defendants.)*

150.

All of the foregoing allegations are repeated and realleged as though fully set forth herein.

151.

Defendants and Plaintiffs entered a valid, enforceable retail lease agreement.

152.

In exchange for payment for the requisite leasing fees, Defendants agreed to lease property to the Tago International Center for a seven-year lease term on a non-discriminatory basis.

153.

Defendant Perkel, acting as an authorized agent of SC Apartments LLC and Landlocked LLC, intentionally discriminated against Mr. Tago based on his race

by making offensive racial comments, derogatory comments directed to the African American client base, and a series of other race-based microaggressions.

154.

SC Apartments LLC and Landlocked LLC intentionally permitted and ratified the behaviors of their Agent Perkel by refusing to intervene after complaints from Plaintiffs, initiating the contract addendum, terminating the lease, and others.

155.

Defendants denied Mr. Tago the same right to make and enforce contracts, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, as described above and to be further proved at trial, because of his race, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981.

156.

Based on all the facts incorporated to support this Count, Plaintiffs have demonstrated that Defendants violated Mr. Tago's Section 1981 rights by interfering with his contractual rights to enforce lease provisions and perform business operations at the Property without racial hostility.

## COUNT II:
## RETALITORY RACIAL DISCRIMINATION IN CONTRAVENTION OF SECTION 1981
*(Against all Defendants.)*

157.

All of the foregoing allegations are repeated and realleged as though fully set forth herein.

158.

Defendants retaliatory conduct, following Mr. Tago's refusal to sign the addendum constitutes unlawful retaliation in violation of Section 1981.

159.

Defendants acted with intentionality, malice, and reckless indifference to Mr. Tago's federally protected rights. Defendants, by and through their executives and agents, perpetrated racial discrimination, subjected Mr. Tago, or caused him to be subjected, to the deprivation of rights, privileges, or immunities secured by the Civil Rights Act of 1866, 42 U.S.C. § 1981.

160.

Based on all the facts incorporated to support this Count, Mr. Tago has demonstrated that Defendants violated Mr. Tago's Section 1981 rights by subjecting him to retaliatory conduct that has a range of days to weeks of closely proximate protected activities.

### COUNT III: BREACH OF CONTRACT
*(Against all Defendants.)*

161.

All of the foregoing allegations are repeated and realleged as though fully set forth herein.

162.

Defendants and The Tago International Center entered a valid, enforceable retail lease agreement.

163.

In exchange for payment for the requisite leasing fees, Defendants agreed to lease property to The Tago International Center for a seven-year lease term on a non-discriminatory basis.

164.

The Tago International Center has substantially performed his obligations under the Retail Lease, subject to COVID-19 pandemic delays outside of his control.

165.

Defendants have breached this agreement by failing to allow Plaintiffs to enjoy the premise peaceably and quietly.

166.

Defendants have breached this agreement by failing to complete Mr. Tago's written repair and maintenance requests in a reasonable timeframe, after receiving notice thereof.

167.

Defendants have breached this agreement by restricting Plaintiffs from utilizing the Common Area, including parking and patio area. Pursuant to Article 9(d) of the Retail Lease, in relevant parts, Tenant and Tenant's officers, employees, agents, customers, licensees and invitees shall enjoy a license for the nonexclusive use of the Common Areas solely for ingress and egress…

168.

Defendants have breached this agreement by terminating the Retail Lease without legal basis.

## COUNT IV: RETALIATION
### *(Against all Defendants)*

169.

All of the foregoing allegations are repeated and realleged as though fully set forth herein.

170.

Plaintiffs exercised their rights pursuant to Article 15 of the Retail Lease by contacting Defendants numerous times to request repairs of the Property.

171.

Plaintiffs exercised their statutory rights pursuant to OCGA 44-7-13 to request repairs of the Property.

### 172.

Defendants received notice of Plaintiffs' protected activity via phone, via text, via email, and in-person.

### 173.

After engaging in protected activity, Defendants retaliated against Plaintiffs by terminating their lease agreement without sufficient legal basis.

### 174.

Plaintiff attempted to strong arm Defendants into an unconscionable lease addendum by direct threats of violence, racial epithets, and brandishing of weapons to coerce compliance.

### 175.

As a result of Defendants' retaliatory actions, Plaintiffs have incurred damages.

**COUNT V: ASSAULT PURSUANT TO O.C.G.A. 51-1-14**
*(Against Defendant Perkel)*

### 176.

All of the foregoing allegations are repeated and realleged as though fully set forth herein.

177.

Defendant Perkel intended to cause and did cause Mr. Tago to suffer apprehension of an immediate and harmful contact.

178.

Defendant deliberately assaulted Mr. Tago through the display of his automatic rifle and handgun and direct threats on May 22 and May 23, 2021, just two feet in front of Mr. Tago's person.

179.

Mr. Tago was at all relevant times aware of Defendant's actions, intentions, and ability to injure Mr. Tago and his guests, by virtue of bearing witness to said events on May 22, 2021, and May 23, 2021, which included both children and elderly persons.

180.

As a direct and proximate result of the willful, malicious, and intentional actions of Defendant, Mr. Tago suffered mental anguish, humiliation, and embarrassment.

### COUNT VI:
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
*(Against Defendant Perkel)*

181.

All of the foregoing allegations are repeated and realleged as though fully set forth herein.

182.

Defendant Perkel intentionally caused severe emotional distress to Mr. Tago by his willful, extremely reckless, and indifferent conduct, including but not limited to intentionally brandishing an automatic rifle and handgun at Mr. Tago and his guests; intentionally threatening Mr. Tago and his guests with belittling racial epithets including the N word and "boy" references; and disregarding police instruction to resolve the matter in civil court.

183.

Defendant's actions were well beyond all bounds of decency and were done with the purpose of inflicting emotional distress and fear.

184.

Defendant's actions were so extreme in degree that a reasonable member of the community would regard such conduct as atrocious, going beyond all possible bounds of decency and as being utterly intolerable in a civilized community.

185.

As a direct and proximate result of Defendant's conduct, Mr. Tago suffered extreme emotional distress, including multiple emotional fits of crying, hopelessness, and depression.

**COUNT VII:**
**TORTIOUS INTERFERENCE WITH BUSINESS OPERATIONS**
*(Against All Defendants)*

186.

All of the foregoing allegations are repeated and realleged as though fully set forth herein.

187.

Pursuant to the Retail Lease, Plaintiffs acquired clients who contracted Tago International Center for short-term event rentals.

188.

Defendants had knowledge of the Tago International Center's valid and enforceable event contracts.

189.

Defendants were aware that Plaintiffs sole basis for business revenue was the creation of short-term event contracts between Plaintiffs and third parties.

190.

Defendants intentionally and unjustifiably induced a breach of contract by terminating the Retail Lease without legal basis. The Tago International Center was forced to breach event contracts with his clients—forcing him to forfeit deposits and revenue—his sole basis of business income generation.

191.

Defendants intentionally and unjustifiably induced a breach of contract by failing to repair hazardous conditions, causing an unsafe environment for Mr. Tago, and forcing him to breach event contracts due to safety concerns.

192.

As a direct and proximate result of Defendants' intentional, wrongful, and unjustifiable conduct, the Tago International Center suffered wage losses and compensatory damages.

## COUNT VIII:
## ATTORNEY'S FEES
*(Against all Defendants)*

Based on the facts alleged in this Complaint, Plaintiffs are entitled to attorney's fees against all Defendants under 42 U.S.C. § 1988(b), 42 U.S.C. § 2000e-5(k), Article 30(s) of the Retail Lease, and all applicable laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court:

a) That process issue and service be had on each Defendant;

b) That a jury trial be had on all issues so triable;

c) That Plaintiff recover all costs of this litigation;

d) That Plaintiff be awarded all other expenses in an amount to be

determined at trial, including attorney's fees;

e) That Plaintiff have judgment against Defendants for punitive damages;

f) That this Court grant the equitable relief Plaintiff has requested; and

g) That Plaintiff receives such other and further relief as this Court deems

just and proper.

DATE: June 26, 2021

Respectfully submitted,

_____

Angelik Edmonds
Attorney for Mr. Godfrey Tago
GA Bar: 650757
Edmonds Law Office of Civil Rights LLC
691 John Wesley Dobbs Avenue NE
Suite V-17 Atlanta, Georgia 30312
O: 678-404-1239
F: +1 678-623-9090
E: angie@aedmondslaw.com